IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| SKYLINE MANOR, INC., ) | |
| ) | CASE NO. BK14-80934 |
| Debtor(s). ) | A15-8035 |
| RON ROSS, Chapter 11 Trustee, ) | |
| ) | |
| Plaintiff, ) | CHAPTER 11 |
| ) | |
| vs. ) | |
| ) | |
| SCOTT A. BUCKLES; CLARKE ) | |
| REALTY, LLC; DAN ELLIOTT, INC.; ) | |
| DELK MCNALLY LLP; EAGLE ONE ) | |
| PROPERTIES, LLC; WEMAMM1, LLC; ) | |
| HARRISON & MOBERLY, L.L.C.; ) | |
| HERITAGE MEDICAL GROUP, INC.; ) | |
| GERRI M. LONG; HOWARD LONG; ) | |
| JARED K. MCCOWAN; CINDA D. ) | |
| MITCHENER; PARAGON REALTY, LLC; ) | |
| R L RYNARD CONSTRUCTION, INC. a/k/a ) | |
| R L CONSTRUCTION, INC.; KENDALL ) | |
| DWAYNE RHEA; RUBICON FOODS, LLC; ) | |
| WALNUT INVESTORS, LLC; KIMBERLY ) | |
| R. WILHOIT; and ZIONSVILLE ) | |
| INVESTORS, INC., ) | |
| ) | |
| Defendants. ) | |

<u>ORDER</u>

This adversary proceeding came on for trial in Omaha, Nebraska, on May 8 and 9, 2017. T. Randall Wright, Brandon R. Tomjack, and Nicholas Buda appeared for the plaintiff, and Kathryn J. Derr appeared for defendants Clarke Realty, LLC; Dan Elliott, Inc.; R L Rynard Construction, Inc.; and Rubicon Foods, LLC. Post-trial written arguments have been submitted, and the matter is now ready for decision.

I. Background

The trustee of the Skyline Manor Chapter 11 bankruptcy estate initiated this adversary proceeding against numerous defendants to avoid and recover approximately $600,000.00 in allegedly fraudulent transfers under 11 U.S.C. §§ 544(b)(1), 548(a)(1)(A) and (B), and 550, and the Nebraska Uniform Fraudulent Transfer Act, Neb. Rev. Stat. § 36-701, *et seq*. His statutory authority

to do so is explicitly bestowed by the Bankruptcy Code. From the defendants at trial, the trustee seeks to recover approximately $165,000.00 in payments for which he claims the debtor did not receive equivalent value in return. The issues had been narrowed on summary judgment prior to trial, so the evidence at trial focused mainly on whether Skyline Manor was solvent or able to pay its debts and operate its business. As to defendant R L Construction, the evidence addressed the additional element of whether it was an initial transferee.

Skyline Manor is a non-profit corporation providing a continuum of care for senior citizens in Omaha, Nebraska. The facility was built in the late 1960s, and consists of separate units for independent living, assisted living, and skilled nursing care. In the 2000s, it began to experience financial difficulties, and John Bartle was hired as the entity's chief restructuring officer in 2009. Mr. Bartle worked for BVM Management, Inc., a company that manages a number of health care and residential facilities in five states. BVM assumed management of Skyline Manor in 2012, when Skyline's previous management company, AmeriCare Communities III, LLC, merged with BVM. Skyline's financial condition continued to deteriorate, and it filed a Chapter 11 bankruptcy petition on May 8, 2014. Ron Ross was appointed as Chapter 11 trustee on May 30, 2014.

The trustee alleges that, beginning at least in 2011, the debtor made payments to the defendants for which the debtor did not receive reasonably equivalent value, while the debtor was insolvent or lacked funds to pay its bills or operate its business, with the intent to hinder, delay, or defraud future creditors. Specifically, the trustee asserts the debtor paid $9,724.06 to Clarke Realty for BVM's rental of Clarke Realty's premises in Indiana in July 2013. The trustee asserts the debtor paid $31,953.46 to Dan Elliott, LLC, in 2012 for construction work done on the Bartles' personal residence in Indiana. The trustee also asserts the debtor paid $37,505.32 to Rubicon Foods between February 2012 and June 2013 for rent and related expenses for office space leased to AmeriCare Companies, Inc. Finally, the trustee asserts the debtor made deposits of $86,680.55 into a Tennessee bank account belonging to R L Rynard Construction, Inc., between September 2011 and July 2012.

The court granted partial summary judgment against Clarke Realty, Dan Elliott, Inc., and Rubicon Foods in February 2017. With respect to Clarke Realty, the court denied the "ordinary course of business," "indirect benefit," and "identity of interests" arguments raised by the defense and ruled the debtor received no benefit from its payment to Clarke Realty for BVM's rent of the leased premises in Fishers, Indiana, for the month of June 2013. As to Rubicon Foods, the court denied its "ordinary course of business," "indirect benefit," and "identity of interests" defenses and ruled the debtor received no benefit from its payment of AmeriCare's rent from February 2012 through June 2013. Dan Elliott, Inc., did not oppose summary judgment on the issue of whether the debtor received reasonably equivalent value from the transfers to pay for construction work on the Bartles' personal residence. These rulings left the debtor's insolvency as the only element to be established at trial with regard to the allegations against these defendants. Because no dispositive motions had been filed concerning R L Rynard Construction, all of the fraudulent transfer elements were at issue in the trial.

II.  Law

A. Fraudulent transfers under § 548(a)(1)(A)

The Trustee must prove the following elements to succeed on his section 548(a)(1)(A) fraudulent transfer claim: (1) the debtor had an interest in property, (2) the debtor voluntarily or involuntarily transferred that interest, (3) the transfer occurred on or within two years before debtor filed for bankruptcy relief, (4) the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor on or after the date of the transfer. 11 U.S.C. § 548(a)(1); *see also Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 898 (Bankr. D.N.D. 1999); *Allred v. Hauser (In re Jundt)*, No. ADV 13-1011, 2014 WL 2742868, at \*6 (Bankr. D.S.D. June 17, 2014). Actual harm to creditors is not an element. *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355, n.6 (8th Cir. 1995) (citation omitted).

*Doeling v O'Neill (In re O'Neill)*, 550 B.R. 482, 497 (Bankr. D.N.D. 2016).

Once the trustee offers evidence sufficient to create a presumption of fraudulent intent, the burden shifts to the transferee to prove some legitimate supervening purpose for the transfers at issue. *Id.* at 499-500 (citing *Ritchie Capital Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861-62 (8th Cir. 2015) and *Kelly*, 141 F.3d at 802).

B. Constructively fraudulent transfers under § 548(a)(1)(B)

Section 548(a)(1)(B)[1] permits a trustee to recover certain transfers regardless of the

---

[1] § 548 - Fraudulent transfers and obligations

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

. . .
(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur,

(continued...)

transferor's intent, so long as the debtor received less than reasonably equivalent value for the transfer and was in a fragile financial state. 5 *Collier on Bankruptcy* ¶ 548.05. The fragile financial condition referenced in Collier's treatise covers insolvency, possessing an unreasonably small capital, or believing that the debtor would incur debts beyond its ability to repay after the transaction. § 548(a)(1)(B)(ii).

Insolvency is defined in § 101(32) as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." In determining whether the debtor was insolvent, the court should examine the debtor's balance sheet to determine whether the value of its assets were greater than its liabilities at the time of the transfer in question. *Killips v. Schropp (In re Prime Realty, Inc.)*, 380 B.R. 529, 534 (B.A.P. 8th Cir. 2007). Under the balance sheet test, essentially restating the statutory definition, a debtor is insolvent if the sum of its debts is greater than all of its property, fairly valued. *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996). "Fair valuation is generally defined as the going concern or fair market price. . . . If . . . a company is on its deathbed, assets should be valued on a liquidation basis." *Cole v. Strauss*, No. 2:13-CV-04200-NKL, 2014 WL 4055787, at *6 (W.D. Mo. Aug. 15, 2014), *aff'd*, 608 F. App'x 438 (8th Cir. 2015) (quoting *In re Payless Cashways, Inc.,* 290 B.R. 689, 699 (Bankr. W.D. Mo. 2003)).

"Unreasonably small capital" covers the types of financial situations in which the debtor is left solvent, but just barely so, and in a condition that bankruptcy or liquidation is substantially likely.

> This requires a court to "examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable" after a transfer. *Dahar v. Jackson (In re Jackson)*, 459 F.3d 117, 123-24 (1st Cir. 2006) (quoting *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) and citing *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (holding that under the "unreasonably small capital" provision in 11 U.S.C. § 548, courts must assess "the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself" after a transfer)).

*Killips v. Schropp (In re Prime Realty, Inc.)*, 376 B.R. 274, 280 (Bankr. D. Neb.), *aff'd*, 380 B.R. 529 (B.A.P. 8th Cir. 2007).

---

[1](...continued)
debts that would be beyond the debtor's ability to pay as such debts matured; or
                (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

A debtor's belief regarding its ability to pay going forward requires the court to consider the debtor's financial situation at the time of the transfer and whether the debtor could reasonably believe it would be able to pay its bills as they came due.

> "In other words, a debtor cannot transfer property or incur obligations in anticipation of financial difficulties. It is irrelevant that the debtor is solvent at the time of the transaction or did not intend to defraud creditors in the transaction." 4 Norton Bankr. L. & Prac. 3d § 67:6.
>
> The "'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured." *In re WRT Energy Corp.*, 282 B.R. 343, 415 (Bankr. W.D. La. 2001). Such an intent or belief may be inferred where the facts and circumstances surrounding the transaction indicate that the debtor could not have reasonably believed he would be able to pay his debts as they matured. *Id.*; *In re LendXFinancial, LLC*, 2012 WL 1597394, at *11; *see also In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993) (requiring a subjective belief standard, but noting that such belief may be found from the surrounding facts and circumstances where no express belief has been stated).

*Wallace v. McFarland (In re McFarland)*, No. 11-10218, 2013 WL 5442406, at *15 (Bankr. S.D. Ga. Sept. 30, 2013), *aff'd*, No. 11-10218, 2014 WL 3925279 (S.D. Ga. Aug. 8, 2014), *aff'd*, 619 F. App'x 962 (11th Cir. 2015).

    C.    <u>Fraudulent transfers under NUFTA</u>

        1.    § 36-705 Transfers fraudulent as to present and future creditors.

Under this statute,

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
    (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
    (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
        (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
        (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b) In determining actual intent under subdivision (a)(1) of this section, consideration

>   may be given, among other factors, to whether:
>   (1) the transfer or obligation was to an insider;
>   (2) the debtor retained possession or control of the property transferred after the transfer;
>   (3) the transfer or obligation was disclosed or concealed;
>   (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>   (5) the transfer was of substantially all the debtor's assets;
>   (6) the debtor absconded;
>   (7) the debtor removed or concealed assets;
>   (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>   (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>   (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>   (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Neb. Rev. Stat. § 36-705.

>   2.   § 36-706(a) Transfers fraudulent as to present creditors.

>   Under the Nebraska Uniform Fraudulent Transfer Act, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Neb. Rev. Stat. § 36–706(a).

*RSG, Inc. v. Sidump'r Trailer Co.*, No. 8:06CV507, 2012 WL 4486304, at *6 (D. Neb. Sept. 27, 2012).

>   Insolvency is defined in the Nebraska statute:

>   (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>   (b) A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.
>   . . .

Neb. Rev. Stat. § 36-703.

    Insolvency under § 36-703 has been found when a corporation used funds to purchase a vehicle for the benefit of an insider because, at the time of the transfer, the corporation owed delinquent payroll taxes it was unable to pay, and had unpaid shareholder loans, a bank overdraft, and past-due truck lease payments. *Dillon Tire, Inc. v. Fifer*, 589 N.W.2d 137, 143 (Neb. 1999).

    In an action seeking to set aside a fraudulent transfer, the burden of proof is on a creditor (the trustee in a bankruptcy case) to prove, by clear and convincing evidence, that fraud existed in a questioned transaction. *Eli's, Inc. v. Lemen*, 256 Neb. 515, 591 N.W.2d 543, 555 (1999). Clear and convincing evidence is "that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved." *Id.*, at 555-56 (quoting *Dillon Tire, Inc. v. Fifer*, 256 Neb. 147, 589 N.W.2d 137, 142 (1999)).

*Myers v. Blumenthal*, 534 B.R. 6, 15 (D. Neb. 2015).

### III.  Discussion

**A.**  <u>Insolvency</u>

    1.    Generally not paying debts as they become due.

    The evidence is clear that Skyline was not paying its bills in a timely fashion in 2011, 2012, and 2013. Skyline was defaulting on payments to trade creditors such as SOS Heating and Cooling, Tritz Plumbing, Terry Hughes Tree Service, Cormaci Construction, and Larry's Boiler Service in 2011. Some of these creditors filed lawsuits in 2012 and 2013 and obtained summary or default judgments. Skyline was also letting healthcare creditors go unpaid during this time frame – Omnicare Pharmacy, Midwest Neurosurgery filed lawsuits and obtained judgments in 2012 and 2013. As simply one example, the evidence indicates that Skyline repeatedly defaulted, beginning in early 2010, on its obligation to pay RehabCare for therapy services provided to Skyline's patients, so the parties entered into a forbearance agreement in the latter part of 2010. Skyline defaulted under that agreement, so the parties entered into a revised payment agreement in 2011. After yet another default, the parties entered into a second forbearance agreement in December 2011. Following Skyline's failure to perform under the second forbearance agreement, RehabCare terminated its services and filed a lawsuit in early 2012. Some payments were made thereafter, but RehabCare is still owed $185,000.00.

    Two Skyline administrators who were in charge of the facility in 2013 testified to their personal experience with Skyline creditors seeking payment of past-due bills, reduced frequency of food deliveries because Skyline did not timely pay the food vendor, and lapses in staff health insurance due to unpaid premiums.

    Timothy Hagerty testified about his more than 40 years of administration experience at residential facilities for senior citizens. He was hired by Mr. Bartle to handle the day-to-day operations at Skyline in January 2013 and quickly learned that Skyline was not paying its bills,

although he was not privy to the company's financial statements. He testified about telephone calls and correspondence directed to him regarding unpaid utility bills and facility repair bills, as well as unpaid OSHA penalties and employee insurance premiums. He recalled instances of Skyline maintenance staff "cannibalizing" an empty building on campus for parts to make repairs in occupied buildings because Skyline could not afford to pay for parts or repairs. He mentioned that one of Skyline's newer vehicles was repossessed for failure to make payments, leaving the facility with other less-reliable vehicles in its fleet. Mr. Hagerty also testified about correspondence from the Omaha Public Power District ("OPPD") regarding delinquent bills and the threat to shut off power to the facility unless payment was made immediately. He referred that request to Mr. Bartle and the power was not disconnected. After mere weeks as the Skyline administrator, Mr. Hagerty submitted his resignation, effective February 28, 2013. He explicitly told Mr. Bartle that Skyline's "very serious payables problem" was a major factor in his decision to resign.

Sandra Leimer succeeded Mr. Hagerty as the administrator of the facility in March 2013. She had 15 years of experience as a health-care administrator, and had worked at Skyline for six-and-a-half years prior to being named executive director. As executive director, Ms. Leimer oversaw Skyline's day-to-day business operations while Mr. Bartle handled the financial aspects of the enterprise. She testified none of the Omaha staff, including her, was privy to Skyline's financial information, but she knew in a general sense, both before and after she became executive director, the company was experiencing financial difficulties. She testified vendors contacted her about past-due invoices, and employees whose paychecks bounced or whose medical insurance claims were denied came to her with requests for assistance. She met with OPPD about Skyline's large unpaid bill to it, which remained unpaid. She testified the facility's telephone service was shut off a number of times because the bill had not been paid. She testified to being creative with the facility's food orders when the food provider would not make deliveries because the unpaid bill exceeded an amount agreed to between the vendor and Mr. Bartle. According to Ms. Leimer, Skyline missed a food delivery about every two weeks throughout her tenure as executive director, which lasted until the bankruptcy petition was filed in May 2014. However, due to menu adjustments and Ms. Leimer's efforts to order larger food deliveries when she could, Skyline's residents never went unfed. When creditors contacted Ms. Leimer about unpaid invoices, she notified the AmeriCare corporate office, which would then make payments on the bills.

Ms. Leimer also testified to government-required facility inspections that were not made because the inspectors were not paid, which put Skyline's license at risk although the license was never revoked or not renewed. She reinforced Mr. Hagerty's testimony about maintenance and repairs that were not done because vendors' previous bills remained unpaid. Some of her more disconcerting testimony described how she personally paid for residents' medical supplies out of her own pocket because Skyline's pharmacy vendor refused to make further deliveries when its bill went unpaid. Likewise, employee paychecks – including Ms. Leimer's, beginning in April or May of 2013 – began to be returned for insufficient funds. Near the time of the bankruptcy filing, unpaid paychecks were being returned each pay period. She testified that Mr. Bartle usually made good on the paychecks within approximately two weeks. In addition, some employees discovered themselves without medical insurance, because the premiums were not being paid even though amounts were being deducted from the employees' paychecks. Skyline also failed to pay its payroll taxes in 2012,

2013, and 2014, resulting in a claim exceeding $1 million.

Additional testimony about Skyline's non-payment of bills came from Floyd Prine, OPPD's account representative for the Skyline account from 2010 to 2014. Skyline's account had been in arrears since January 2012. Mr. Prine initiated numerous conversations with Mr. Bartle about bringing the account current, which generally resulted in small cure payments and promises of future payments on account when Mr. Bartle was able to obtain refinancing. By September 2013, Skyline owed OPPD approximately $140,000.00 in monthly arrearages and late fees, plus a $70,000.00 deposit. The parties executed a payment agreement under which Skyline committed to paying approximately $120,000.00 of that amount by early December 2013 and bringing the account current by the end of that year through refinancing. By early 2014, Skyline had defaulted on that agreement, the delinquent amount exceeded $200,000.00, and OPPD was threatening to disconnect Skyline's electricity. Mr. Prine testified that disconnection notices are viewed as a last resort to encourage payment, and OPPD would not actually shut off service to the care facility. It did disconnect the power to the on-site residence of the campus security guard to make a point, however.

The testimony of these three witnesses establishes that Skyline was not paying all of its bills as they became due, certainly throughout 2012 and 2013, but even in 2011, payments to some creditors were late or were not made at all. The evidence also indicates that Skyline knew it was incurring debts it was unable to pay, as demonstrated by Mr. Bartle's negotiations with and repeated but futile promises to pay creditors such as OPPD. The defendants have not demonstrated facts to the contrary.

The defendants argue that Skyline's intention is the only pertinent issue and there is no evidence that Skyline did not intend to pay its debts. In support of this contention, the defendants argue that Skyline had credit from its vendors, it had obtained a large loan and line of credit, it was maintaining debt service to its primary lender, and it continued to operate despite creditor lawsuits and even paid some of the judgments during this time. The debtor's intent requires a subjective determination, but under the facts as presented at trial, it is absurd to think the debtor, through Mr. Bartle, could have reasonably believed Skyline could pay its debts as they became due in this time frame. Skyline did pay some bills, but clearly it let others slide, even to essential creditors such as the power company, the medical supply provider, and the food vendor, as well as to the facility's staff. The past-due balances were sizable on some of these debts, but Skyline continued to let the arrearages accrue while making empty promises to pay as soon as it could secure refinancing. The refinancing was not forthcoming, yet Skyline continued to incur debts that it knew or should have known were beyond its ability to pay as they became due.

The legal standard for whether a debtor is generally not paying its debts comes from involuntary bankruptcy cases. A court generally considers the number of unpaid claims; the amount of the claims; the materiality of nonpayment; and the overall conduct of the debtor's financial affairs. *Perez v. Feinberg (In re Feinberg)*, 238 B.R. 781, 783 (B.A.P. 8th Cir. 1999) (vacated Dec. 16, 1999); *Murrin v. Hanson (In re Murrin)*, 477 B.R. 99, 106-07 (D. Minn. 2012); *In re Mikkelson*, 499 B.R. 683, 689 (Bankr. D.N.D. 2013). The number and amount of the claims have been described as the most salient factors. *Murrin*, 477 B.R. at 107. However, "[i]t is important not to allow judicial

glosses . . . to supercede the statute itself." *Krieger v. Educ. Credit Mgmt. Corp.*, 713 F.3d 882, 884 (7th Cir. 2013) (in the context of the dischargeability of student loans). Here, while the record contains no evidence as to these two factors during the time frame of the transfers, it is abundantly clear Skyline was letting sizable and critical monthly debts go unpaid or only partially paid, as explained above. These were not minor or easily overlooked expenses; Mr. Bartle used Skyline's funds to pay personal debts or expenses of his other businesses. He clearly was juggling his company's various obligations and making payments to Skyline creditors only as the creditors became more insistent or the situation became more dire. The debtor was generally not paying its debts as they became due, and it was incurring new debt that it knew it was unable to pay. Therefore, it was insolvent at all material times since early 2011. Neb. Rev. Stat. § 36-703; 11 U.S.C. § 548(a)(1)(B)(ii)(III).

      2.      Balance-sheet insolvency.

At trial, each side presented the testimony of certified public accountants in support of their respective positions. As the trial began, counsel for the defendants pointed out to the court that the analysis by the trustee's accountant, Luke Northwall, was based on incomplete information and therefore was unreliable. Counsel for the trustee then explained that Mr. Northwall drew his data from a website to which Skyline posted its financial information. Mr. Northwall knew the data was not completely reliable, but did not realize that what he thought was quarterly data was actually data from just one month of the quarter. This skewed his analysis of Skyline's debt-service coverage ratio, and the trustee requested an extension of time to rectify the problem. The court denied the continuance because the incorrect analysis concerned just one aspect of the trustee's case and the trial could move forward on the parties' other evidence.

William Kenedy, the expert witness for the defendants, testified to the general unreliability of the Northwall report beyond the incomplete quarterly data. Mr. Northwall had testified about his adjustments to some of the data as he prepared his report. In particular, he testified that he found the amount of accounts receivable in the Skyline data to be "surprising," so he adjusted it. He also wrote off all the intercompany receivables as uncollectible, without any analysis. Likewise, he gave the pre-paid expenses and inventory categories a zero value. Mr. Kenedy challenged these adjustments, noting he was unable to reconcile most of them and calling them improper because Mr. Northwall simply made assumptions about these amounts and appeared to adjust them based on a gut feeling, rather than investigating any figures he had questions about. Mr. Kenedy also called Mr. Northwall's accounts-payable turnover ratio and quick ratio analyses unreliable, and said Mr. Northwall's refusal to rely on third-party real-estate appraisal information "defies standard practice."

Mr. Kenedy, however, did not conduct or provide any financial analysis of his own. He simply provided a critique of Mr. Northwall's report. After hearing testimony from Mr. Northwall and Mr. Kenedy, and considering their respective reports, I conclude that Mr. Northwall's report is not reliable in light of the errors acknowledged by the trustee and the defects and discrepancies noted by Mr. Kenedy. Accordingly, I have not relied on it in ruling on this matter.

The primary factor in the test of whether or not Skyline was solvent on a balance-sheet basis

is the value of Skyline's physical assets. The evidence shows widely varying values for the facility from 2010 to its sale in early 2015. Specifically, a sale-leaseback offer received by Skyline in 2010 for between $9 million and $10 million. The defendants point out that Skyline obtained an $11 million loan from Oxford Finance, secured by all of Skyline's real and personal property, and argue that the value of said assets necessarily were some proportion greater than $11 million or the commercial lender would not have made the loan. Mr. Bartle's company requested appraisals by Dennis Knudson in 2010 and 2013; the appraised value in 2010 was $16 million and the 2013 appraised value was $18.5 million. The broker marketing the property during the bankruptcy case initially estimated a sale price between $16 million and $20 million. Ultimately, Skyline was sold in 2015 for approximately $13 million. Several prospective buyers contacted by the real estate broker were reluctant to bid on the property in light of the significant capital expenditures required to modernize the facility. Skyline's age, condition, and location had a depressive effect on the property's sale value. This is also apparent from Mr. Knudson's appraisals, in which he compared it to newer and more intimate facilities located in other parts of the Omaha metropolitan area. Skyline's institutional structure and its location in an established area caused its desirability to pale in comparison to newer properties that would not require as much renovation or expenditures for deferred maintenance. In light of these realities, the evidence was simply insufficient to draw any conclusions as to solvency on a balance sheet basis. In any event, it is not necessary for the trustee to establish balance sheet insolvency when the trustee has established the debtor was generally not paying its debts as they became due. *Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.*), 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013).

Finally, the defendants argue that judicial estoppel should apply to prevent the trustee from claiming the debtor was insolvent. Specifically, in their brief the defendants assert that the trustee is "play[ing] fast and loose with the integrity of this court and the judicial process" because of inconsistent financial information. However, that argument is not well-founded and, frankly, is uncalled for. Some of the financial information provided by the trustee to the business broker early in the case was prepared by Mr. Bartle's management company. The trustee disclaimed knowledge of its reliability or accuracy and encouraged anyone considering the purchase of the business to perform their due diligence. As the trustee became more familiar with the debtor and hired his own financial experts, it became clear that the prior information was largely inaccurate. For the defendants to insinuate that the trustee is only disavowing the previous information because recent information is more favorable to his case is disingenuous and an unwarranted attack on the trustee's character.

      B.      <u>R L Rynard Construction</u>

The issue at trial regarding defendant R L Rynard Construction is whether it was an initial transferee of the transfers from Skyline. Under 11 U.S.C. § 550(a), to the extent that a transfer is avoided under the Bankruptcy Code, the trustee may recover the value of such property from the initial transferee of such transfer or the entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee. To be an initial transferee, "a party must have dominion and control over the transferred funds." *Luker v. Reeves (In re Reeves)*, 65 F.3d 670,

676 (8th Cir. 1995).

> The "dominion test," which arises out of the Seventh Circuit's decision in *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988), focuses on whether the party "has legal title to [the funds] and the ability to use them as [it] sees fit." *Universal Serv. Admin. Co. v. Post–Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1071 (9th Cir. 2006). The "control test" derives from the Eleventh Circuit's decision in *In re Chase & Sanborn Corp.*, 848 F.2d at 1199, and "takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." *In re Incomnet, Inc.*, 463 F.3d at 1071. The control test is a more lenient standard than the dominion test. *Id.* The Eighth Circuit has not clearly articulated whether it views the dominion test or control test as the proper determinant of a party's initial transferee status or whether the proper test is some combination of the two.

*Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.)*, 547 B.R. 292, 310 (N.D. Iowa 2016). The case is currently on appeal to the Eighth Circuit and has been argued and submitted to the court.

The trustee alleges that in 2011 and 2012 Skyline transferred $85,680.55 into a Tennessee bank account owned by R L Rynard Construction. At trial, Mr. Robert Rynard, Jr., testified he owned R L Rynard Construction. He formed the company to bid on construction and remodeling jobs, In 2010, R L Rynard Construction opened an account with Fifth Third Bank in Memphis, Tennessee, in connection with bidding on a job to remodel some apartments there. The construction company did not win the job, but the bank account remained open. The construction company did not do any other business and essentially sat idle. In February 2011, R L Rynard Construction was dissolved when Mr. Rynard and his wife divorced. The company's Tennessee bank account remained open, however, because Mr. Rynard's father, who was a business partner with Mr. Bartle, encouraged Mr. Rynard to allow Mr. Bartle to use the account. It apparently did not occur to Mr. Rynard to inquire why Mr. Bartle needed to use the construction company account, or why Mr. Bartle could not open his own account. Another explanation may be that Mr. Rynard was aware that Mr. Bartle employed creative financial practices to move funds among his various enterprises and family members, and Mr. Rynard simply did not want to know the details. At any rate, Mr. Bartle and his assistant began depositing and withdrawing funds from that account in February 2011.

Mr. Rynard testified he received statements for this account through May 2011, until Mr. Bartle changed the address on the account. He testified he does not recall giving his father and Mr. Bartle's assistant authorization as signatories on the account. When shown the account signature card, he testified that he assumes someone forged his signature.

Mr. Rynard testified that neither he nor R L Rynard Construction used the Tennessee account or exercised control over it after January 2011. He was clear that neither he nor the construction company caused any withdrawals to be made from the account after February 2011, and he maintains that neither he nor the construction company benefitted from the funds in that account.

Mr. Rynard's testimony was convincing that he did not exercise dominion or control over the funds in the Tennessee account. While his decision to let Mr. Bartle use the account may be suspect, the evidence is clear that Mr. Rynard did not use the account or the funds in the account in any manner after January 2011. While the trustee argues the "mere conduit" defense to the initial-transferee allegation applies only to fiduciaries or agents of the transferor, that interpretation of the case law is too narrow. In litigation in the *Agriprocessors* case, the bankruptcy court ruled that an individual who cashed checks made out to him by Agriprocessors and paid the proceeds to workers he had hired through his church for a construction project on behalf of Agriprocessors was merely a conduit for the funds and not an initial transferee. *Sarachek v. Wahls (In re Agriprocessors, Inc.)*, 490 B.R. 374 (Bankr. N.D. Iowa 2013). The court explained:

> There is no evidence Wahls ever had the right to put the money to his own use. He certainly never thought that he did. He believed he was duty bound to get the money – all of it – to the workers. He considered it their wages. He testified that the checks were issued with directions on who to pay and how much. Wahls's understanding, quite clearly, was that he was at most a "financial intermediary" that was required to follow the instructions that came with the check. *Bonded Financial Servs.*, 838 F.2d at 893. Trustee presented no evidence to the contrary. Trustee simply suggests that because the checks were made out to Wahls or the Church Wahls served, Wahls and that Church could have used the money how they pleased. This suggestion has no support in the record, which seems to clearly contradict it. Wahls and Garnavillo Gospel believed Wahls had the absolute duty to pay that money to the workers – and that if he kept it he would essentially be stealing it. The facts show Rubashkin [Agriprocessors' president] directed the transaction and Wahls did not have the unrestricted right to do what he wanted with the money. . . .
>
> Under the control test, Defendants are even more clearly not initial transferees. Wahls accepted checks from Rubashkin, cashed them, and distributed the money to individual workers. He was not accepting the checks for his own benefit, no funds ever entered his bank account, and he did not keep any of the money for himself. Rather, he gave the money to individuals who had earned it by working for Debtor. The money was never really his to keep; he was acting as an intermediary between Rubashkin and the workers. Although Wahls held on to the money for a short period of time, Rubashkin actually controlled where the funds went. Looking at the transaction as a whole, it is logical and equitable to find that Wahls was not an initial transferee, but a mere conduit.

*Id.* at 386-87.

In comparing the facts of the *Wahls* case and those in the present case, the evidence shows an even more tenuous relationship between R L Rynard Construction and the funds at issue than in *Wahls*. At most, the trustee has demonstrated that Mr. Rynard opened the Tennessee bank account, allowed Mr. Bartle to use it, and possibly saw a few bank statements in early 2011. While his signature appears to be on the account's signature card when Mr. Bartle's assistant and business

partner were added to the account – Mr. Rynard testified that it merely "looks like" his signature and it may have been forged – there is no evidence Mr. Rynard made any withdrawals during the relevant time frame. The trustee's position in this case is similar to the position taken by the trustee in *Wahls* – that simply because the funds went into the Rynard account and the defendant *could* have used the money, it necessarily follows that the defendant is the recipient of a fraudulent transfers. The evidence does not support this premise. R L Rynard Construction exercised no dominion or control of the funds in the account; it was merely a conduit for Mr. Bartle's use of the money. R L Rynard Construction Company is not responsible for the transfers from Skyline into the account.

## IV. Conclusion

To establish that transfers were made while the debtor's financial state was fragile, the trustee must show the debtor was not paying its debts as they became due, or the debtor was left with unreasonably small capital, or the debtor's liabilities exceeded its assets at a fair valuation. The evidence demonstrates the debtor was not paying its debts as they became due. As this was the only element necessary to establish fraudulent transfers to Clarke Realty, LLC; Dan Elliott, Inc.; and Rubicon Foods, LLC, judgment avoiding the transfers will be entered in favor of the trustee and against these defendants under § 548(a) and NUFTA.

Because the evidence did not establish that defendant R L Rynard Construction, Inc., was an initial transferee of the transfers, judgment will be entered in favor of this defendant.

The defendants' motion for judgment on partial findings, made at the close of the trustee's case and on which the court deferred ruling under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(c), is denied.

Default judgments have previously been entered against defendants Harrison & Moberly, L.L.C.; WEMAMM1, LLC; and Kendall Dwayne Rhea. Settlements agreeing to the avoidance of the transfers to and recovery of sums from defendants Scott A. Buckles; Delk McNally, LLP; Heritage Medical Group, Inc.; Gerri M. Long; Howard Long; Jared McCowan; Cinda D. Mitchener; Kimberley R. Wilhoit; Walnut Investors, LLC; Zionsville Investors, Inc.; and Paragon Realty, LLC, have been reached, so the final judgment to be issued with this order will encompass these defendants as well. Eagle One Properties, LLC, was named as a defendant in the original complaint, but was not included in the amended complaint (Fil. No. 174). The trustee stated in the amended complaint that he had entered into a settlement agreement with Eagle One prior to filing the amended complaint, although no such compromise appears in the record. The judgment will dismiss all of these defendants from the case.

DATED:  June 13, 2017.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    *Nicholas Buda
    Kathryn J. Derr
    *Brandon R. Tomjack
    *T. Randall Wright
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.